1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                        FOR THE DISTRICT OF OREGON

9

10   ADAM P. GUNKEL,                    )
                                        )      No. CV 07-370-HU
11                    Plaintiff,        )
                                        )
12          v.                          )
                                        )   FINDINGS AND RECOMMENDATION
13   MICHAEL J. ASTRUE,                 )
     Commissioner, Social              )
14   Security Administration,          )
                                        )
15                    Defendant.        )
     ────────────────────────────      )
16
     Jodie Anne Phillips Polich
17   4120 S.E. International Way, Suite A209
     Milwaukie, Oregon 97222
18        Attorney for plaintiff

19   Karin J. Immergut
     United States Attorney
20   District of Oregon
     Britannia I. Hobbs
21   Assistant United States Attorney
     1000 S.W. Third Avenue, Suite 600
22   Portland, Oregon 97204
     David M. Blume
23   Special Assistant United States Attorney
     Office of the General Counsel
24   Social Security Administration
     701 Fifth Avenue, Suite 2900 M/S 901
25   Seattle, Washington 98104
          Attorneys for defendant
26
     ///
27

28   FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Adam Gunkel brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f.

### Procedural Background

Mr. Gunkel filed for benefits on September 13, 2004. He alleges disability since October 24, 1999, on the basis of bipolar and manic depressive disorders, a herniated disc, insomnia, headaches, irritable bowel syndrome (IBS), anxiety, anger management, and a speech impediment.

The Commissioner denied his application initially and on reconsideration. On July 11, 2006, a hearing was held before Administrative Law Judge (ALJ) Gary Elliott. The ALJ heard testimony from the claimant, his parents, and Frances Summers, a vocational expert (VE). On September 14, 2006, the ALJ issued a decision finding Mr. Gunkel not disabled. On January 12, 2007, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Mr. Gunkel was 21 years old at the time of the ALJ's decision. He attended school through the 11th grade and worked part-time as a newspaper delivery driver from April 2004 to June 2005.

///

///

FINDINGS AND RECOMMENDATION Page 2

### Medical Evidence

Mr. Gunkel's medical records begin in May 2000, when he was treated by Thomas Richards, M.D. for complaints of a swollen foot. Tr. 116. On examination, his feet appeared normal, without swelling. Dr. Richards wrote, "? Mortons neuroma vs. soft tissue injury," and prescribed Motrin and a change of footwear. Id.

On March 5, 2002, Mr. Gunkel came in with complaints of "achiness in bones" for the past two years, mostly in the upper body. Id. At that time, his height was 5'8" and his weight was 219 pounds. Id. Dr. Richards wrote, "Mom wants patient checked for leukemia--wants spinal tap." Id. On physical examination, Dr. Richards found normal range of motion of the neck, shoulders, and elbows; normal strength in the upper and lower extremities; intact cranial nerves 2-12; and lungs clear. Id. There was some tenderness to palpation in the mid-humerus and along the right lower rib area, but no other significant tenderness noted. Id. Dr. Richards diagnosed myalgia. Id.

On March 20, 2002, Mr. Gunkel went to the emergency room with complaints of back pain. Tr. 148. He was diagnosed with thoracic/lumbar strain and prescribed Flexeril and physical therapy. Id. X-rays of Mr. Gunkel's thoracic and lumbar spine on March 20, 2002 showed minimal scoliosis of the thoracic spine, possibly from positioning, and minimal degenerative disc disease in the lumbar spine. Tr. 160.

On April 1, 2002, Mr. Gunkel was admitted to Lake District Hospital with suicidal thoughts since the previous day. Tr. 150.

FINDINGS AND RECOMMENDATION Page 3

Mr. Gunkel said he had been under "a lot of pressure lately," with concerns that welfare might take away his health care coverage if he did not go to school. Id. He complained of a "constant underlying headache which is made worse when he goes to school." Id. He was currently taking Celexa, Neurontin, Zyprexa, and Atarax. Id. Timothy Gallagher, M.D., Mr. Gunkel's treating physician, wrote that Mr. Gunkel's mood was depressed and his affect flat. Id. Mr. Gunkel reported feelings of worthlessness and hopelessness, and described crying spells, decreased energy level, and weight gain. Id. Dr. Gallagher diagnosed major depression with suicidal ideation, anger control issues, and fatty infiltration of the liver, and admitted him to the hospital. Tr. 151.

In a hospital chart note dated April 2, 2002, Dr. Gallagher wrote that Mr. Gunkel was "feeling much better," and was no longer suicidal. Tr. 130. Mr. Gunkel had talked to a mental health practitioner that day and was planning to follow up with counselor Russ Hunt in two days. He was discharged from the hospital. Id.

On April 15, 2002, Mr. Gunkel saw Dr. Gallagher for headaches, which he reported as constant for the last two years. Tr. 129. Mr. Gunkel denied nausea, vomiting or diarrhea, but said he had some photophobia. He said he had seen a neurologist in the past, with normal MRI and CT scans. Id. He said he had tried Maxalt, Imitrex, Neurontin and ibuprofen without obtaining relief. Id.

Mr. Gunkel denied head trauma, and said his glasses seemed to make the headaches worse. Id. Mr. Gunkel was still taking Celexa, Neurontin, Zyprexa and Atarax. Id. Dr. Gallagher noted that Mr.

FINDINGS AND RECOMMENDATION Page 4

Gunkel's mood was depressed, but that he denied suicidal ideation. Id. Dr. Gallagher diagnosed major depression with history of suicidal ideation, anger control issues, and chronic headaches. He was continued on all current medications and advised to see about getting his glasses changed. Id. On May 31, 2002, Mr. Gunkel was followed up for depression. Tr. 127. Mr. Gunkel reported that his stress was better and his headaches were improving. Id.

On September 6, 2002, Mr. Gunkel was seen for complaints of blood in his stool. Tr. 126. Mr. Gunkel denied any significant pain and said he was having one bowel movement a day, without significant straining. Id. Anoscopy showed moderate internal hemorrhoids. Id. Dr. Gallagher prescribed ibuprofen and Citrucel, and advised Mr. Gunkel to walk half a mile each day. Id.

On November 13, 2002, Mr. Gunkel saw Dr. Gallagher with complaints of worsening abdominal pain after eating. Tr. 123. Dr. Gallagher noted that Mr. Gunkel was not following his exercise recommendation, and that Mr. Gunkel had been "gaining weight steadily over the last two years and is actually up [sixty pounds.]" Tr. 123. Dr. Gallagher told him to cut back on juices and sodas. Id. Dr. Gallagher recorded that in the past, Mr. Gunkel had "quite an extensive workup of stomach pain," positive for diffuse gastritis and fatty infiltration of the liver, but otherwise normal abdomen, pelvis and gallbladder. Id.

On November 20, 2002, Mr. Gunkel had a colonoscopy, which was normal except for mild to moderate internal hemorrhoids. Tr. 122, 144. At follow up on December 4, 2002, Dr. Gallagher noted that

FINDINGS AND RECOMMENDATION Page 5

five biopsies showed no pathological abnormalities in the sigmoid colon, and rectal biopsy showed only mild edema and congestion, negative for inflammatory bowel disease. Tr. 122. Dr. Gallagher noted, however, that ultrasound and biopsies showed fatty infiltration of the liver. Id. Dr. Gallagher expressed concern about Zyprexa causing weight gain, and told Mr. Gunkel to walk a mile a day and take Levbid, Levsin and sugar free Citrucel. Id.

On December 4, 2002, Mr. Gunkel reported abdominal pain "at times," and approximately two episodes of diarrhea a day. Tr. 122. He was advised to cut back significantly on his soda intake, to only one soda a day. Id. Dr. Gallagher wrote that he had "[d]iscussed with patient at length that he needs to get his weight down." Id. Mr. Gunkel's weight at that time was 240. Id.

On January 15, 2003, Mr. Gunkel was seen for a follow up on bipolar disorder and IBS. Tr. 121. Mr. Gunkel reported that he was "doing fairly well" on the Levbid and Levsin, but "not wonderful." Id. Mr. Gunkel was taking Citrucel occasionally. Id. Mr. Gunkel's weight was 247. Dr. Gallagher discussed diet with Mr. Gunkel, urging him to cut back his food intake and soda consumption, and walk a mile a day. Id. Dr. Gallagher noted that the bipolar disorder was well controlled on current medications of Zyprexa and Remeron, but that the weight gain was probably related to these medications. Id.

On January 29, 2003, Mr. Gunkel was seen for a sudden onset of shortness of breath, cough, and wheezing at school. Tr. 121. He had been seen the previous week for an upper respiratory infection. Id.

FINDINGS AND RECOMMENDATION Page 6

Upon examination, his lungs were clear and he had no audible wheezing. Heart rate was regular. Id. He was diagnosed with exercise-induced asthma and given an inhaler. Id.

On February 26, 2003, Dr. Gallagher saw Mr. Gunkel for a cold; he noted that Mr. Gunkel was exercising approximately four times a week, "[n]ot as much as I ask him to do," and was not taking the Citrucel. Tr. 120. Mr. Gunkel reported the IBS was "doing fairly well." Examination was essentially normal. Dr. Gallagher's diagnoses were bipolar disorder, well controlled on Zyprexa and Remeron, "although I think these medications are making him gain quite a bit of weight," obesity which had "gotten worse since being placed on Zyprexa and Remeron," IBS, an improving upper respiratory infection, and anger control issues. Id. Dr. Gallagher told Mr. Gunkel to return in a month for a recheck of his obesity, and noted that if Mr. Gunkel continued to gain weight, it might be necessary to take him off Zyprexa and Remerol and switch to Depakote and Lexapro. Id. Mr. Gunkel's weight was recorded as 245. Id.

On March 11, 2003, Mr. Gunkel was seen by Spencer Clarke, M.D. for complaints of dizziness after falling while playing soccer at school. Mr. Gunkel complained of severe dizziness, headache on the top of the head, sharp pains, intermittent blurred vision. Tr. 119. Physical examination was normal. Dr. Clarke wrote, "I seriously doubt significant injury from a ground level fall as described." Id. Dr. Clarke prescribed ibuprofen for three to four days. Id.

On March 26, 2003, Mr. Gunkel told Dr. Gallagher the IBS "still acts up on him," and that he still had pain. Tr. 196. Dr.

1 Gallagher recommended Tylenol. Id. Dr. Gallagher wrote that Mr.

2 Gunkel stated he stopped the Remeron and Zyprexa on about March 15,

3 2003, and had no problems with depression since discontinuing the

4 medications. Id. Dr. Gallagher wrote, "Not exercising regularly as

5 I asked him to." Id. However, his weight had dropped to 238. Id.

6 Mr. Gunkel's medical records resume one year later. On March

7 26, 2004, Dr. Gallagher wrote that Mr. Gunkel's bipolar disorder

8 was "doing well" on Zyprexa and Remeron, and that his IBS was also

9 "doing fairly well." Tr. 118. Dr. Gallagher noted that Mr. Gunkel

10 had lost weight, and that he was not having problems with anger

11 control. Id.

12 On August 30, 2004, Mr. Gunkel presented at the emergency room

13 of Lake District Hospital with complaints of left sided arm

14 weakness and some slurred speech. Tr. 139. Mr. Gunkel reported the

15 symptoms for five days. Id. It was noted that Mr. Gunkel was not

16 currently taking any medications because he was off the Oregon

17 Health Plan and could not afford the medications. Id. Dr.

18 Gallagher's initial assessment was herniated disc with suspected

19 radiculopathy in the left arm and chronic headaches. Tr. 140. A

20 cervical spine series taken August 30, 2004 showed no unstable

21 process or focal degenerative arthropathy to account for the arm

22 weakness. Tr. 131, 133. A CT of the brain taken at the same time

23 was normal. Tr. 132. Dr. Gallagher prescribed Feldene and explained

24 that herniated discs often improved on their own. Tr. 140. Dr.

25 Gallagher noted that Mr. Gunkel told him he felt he was doing as

26 well if not better off the psychotropic medications. Id.

27

28 FINDINGS AND RECOMMENDATION Page 8

On November 3, 2004, Mr. Gunkel was given a psychological evaluation by Stephen Tibbitts, Ph.D. Tr. 165. Mr. Gunkel reported that while a teenager, he had participated in psychotherapy and taken psychiatric medications, having been placed on Zyprexa, Effexor and Remeron in the 9th grade, but that he was taken off all medications in the 11th grade. Id. Mr. Gunkel said he had gained over 100 pounds in a short period of time while on the medications. Id. During the time he was on the medications, he had also participated in therapy at the Mental Health Clinic, but chose to discontinue it after a year. Tr. 166. Mr. Gunkel stated that since discontinuing therapy, he had learned on his own to stop worrying and currently felt better in regard to anxiety than when he was in high school. Tr. 166. At the time of the evaluation he was not taking psychotropic medication. Id.

Mr. Gunkel was currently living with his father and delivering newspapers part-time. Id. He complained that the job was "extremely tiring" for him, and said he was unable to do his route by himself, often relying on his mother and others to assist him with driving and remembering. Id. Mr. Gunkel said that while at home he "primarily stay[ed] out of his father's way," but did prepare his own food. Id.

Dr. Tibbitts observed that Gunkel's motor behavior appeared to be smooth and coordinated and his gait was normal. Tr. 166. He maintained a natural facial expression throughout the examination and maintained normal eye contact. Id. His speech was normal for intensity, pitch and speed. Id. He demonstrated spontaneity and

FINDINGS AND RECOMMENDATION Page 9

1  productivity. Id. His reaction time was appropriate. Id. His

2  answers to questions were goal directed, relevant and logical. Id.

3  There were no indications of disturbed thought processes. Id. He

4  denied experiencing hallucinations, but reported that he frequently

5  had "daydreams while I operate in reality." Id. One such daydream

6  was extremely upsetting for him, involving a fantasy that he was in

7  a court setting and "everything went south." Id. He reported that

8  his behavior in the court setting "continued to deteriorate to

9  where he fantasized suicidal thoughts followed by homicidal

10 thoughts followed by genocidal thoughts." Tr. 167. The daydream

11 concluded when "I tore everything apart." Id.

12     Mr. Gunkel reported that his mood was generally easygoing, tr.

13 167, but that his usual mood was a 4 on a scale of 1 being bad and

14 10 being good. Id. He experienced some suicidal ideation, not

15 necessarily when in a depressed phase. Id. He denied suicidal

16 intent, but endorsed feelings of worthlessness and hopelessness.

17 Id. His weight was stable, but he had difficulty falling asleep and

18 woke three or more times during the night. Id. He generally went to

19 sleep at about 4 a.m. and got up at about 1 p.m., but did not feel

20 rested when he got up. Id.

21     Mr. Gunkel reported feeling extremely depressed five or six

22 times a month, with periods of elation or hypomanic/manic moods

23 occurring two to three times a month. Id. Mr. Gunkel claimed memory

24 deficits, but his recall of three objects was correct initially and

25 after a 10 minute interval. Id. His immediate auditory attention

26 appeared to be mildly impaired, but overall his recent and remote

27

28 FINDINGS AND RECOMMENDATION Page 10

memory appeared to be grossly intact. Id. His concentration for calculations was excellent. Id. He spelled "world" correctly forwards and backwards. Id. His general fund of knowledge appeared to be somewhat impoverished, but "probably appropriate to his educational level." Tr. 168.

Dr. Tibbitts' diagnoses were bipolar disorder, not otherwise specified; and anxiety disorder not otherwise specified with features of social anxiety and generalized anxiety. Tr. 168.

On January 5, 2005, psychologist Robert Henry, Ph.D., reviewed Mr. Gunkel's records on behalf of the Commissioner. Tr. 170. Dr. Henry opined that Mr. Gunkel had bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes, tr. 173, and an anxiety disorder, tr. 175. Dr. Henry thought Mr. Gunkel had mild restrictions on activities of daily living and maintaining concentration, persistence or pace, and moderate difficulties in maintaining social functioning. Tr. 180. Dr. Henry noted that Mr. Gunkel had stopped taking medication in March 2003 and reported feeling better and having more energy since then. Tr. 182.

Dr. Henry completed a Mental Residual Functional Capacity Assessment. Tr. 189. His findings were that Mr. Gunkel had moderate limitations on 1) the ability to interact appropriately with the general public, 2) the ability to respond appropriately to changes in the work setting, and 3) the ability to set realistic goals or make plans independently of others. Tr. 190. In Dr. Henry's opinion, Mr. Gunkel would work best with limited public contact due

to anxiety, and "could use some help setting vocational goals." Tr. 191. Dr. Henry thought Mr. Gunkel needed a routine environment, but could handle minor changes. Id.

On April 11, 2005, a chart note from Dr. Gallagher's office stated that according to a telephone call from Mr. Gunkel's mother, Mr. Gunkel had been off his medications due to lack of insurance and had suicidal thoughts "off and on today." Tr. 196. Mrs. Gunkel said he also had left sided chest pain and left arm numbness, but "didn't think it was worth going to the ER." Id.

On September 12, 2005, Mr. Gunkel saw Dr. Gallagher with a complaint that his left elbow had been popping for years. Tr. 195. He also complained of poor hearing. Id. Neurological examination was normal, with equal strength and reflexes of the upper extremities bilaterally. Reflexes were "completely normal," and there was no evidence of focal abnormalities. Id. Dr. Gallagher thought Mr. Gunkel had left arm radiculitis, but explained that workup would involve an MRI or seeing a neurologist for nerve conduction studies. Id. Dr. Gallagher wrote that Mr. Gunkel was currently uninsured, and that he stated "he is going to have to [live] with it at this point." Id. Dr. Gallagher recommended referral to an audiologist as well, but "[o]nce again he realizes the price of this and figures he needs to wait on this also." Id.

On June 30, 2006, Mr. Gunkel's lawyer wrote a letter to Dr. Gallagher summarizing a telephone conversation and asking Dr. Gallagher to initial the letter if it "accurately summarizes your opinion." Tr. 198-99. Dr. Gallagher initialed the letter.

FINDINGS AND RECOMMENDATION Page 12

The letter recited that the lawyer had asked Dr. Gallagher to complete forms and questionnaires, and that they indicated that Mr. Gunkel "had few limitations physically to perform work, other than the limitations of his irritable bowel syndrome requiring ready [and] unrestricted access to a restroom." Tr. 198. The letter continued that with respect to Mr. Gunkel's complaints of headaches, neck pain, light sensitivity, asthma triggered by exertion, difficulty hearing, left arm weakness and difficulty sleeping, "you explained that in your experience, other people work with these kinds of problems and that although Adam has difficulties with each of these conditions, you do not believe these should prevent him from working, but they have prevented Adam from working." Id.

According to the letter, Dr. Gallagher believed, on the basis of descriptions by Mr. Gunkel's parents of violent "explosions" of which Dr. Gallagher had not seen any evidence, that "any work Adam is capable of would have to have extremely limited contact with other people and be able to work independently at his own pace." Id.

### Hearing Testimony

Mr. Gunkel testified at the hearing that he had quit his paper route in June 2005, tr. 208, because he had headaches "to the point where I was unable to drive, unable to focus..." Tr. 209. Mr. Gunkel said he was unable to work because of problems with stress, which caused him to lose control of his bowels and required spending four to five hours a day in the bathroom. Tr. 209. He said

FINDINGS AND RECOMMENDATION Page 13

he also had problems holding his temper, with "outbursts of anger that I don't always remember," and that he had had "people actually afraid of me as a result of these outbursts." Id. Mr. Gunkel said when he was around people he got nervous, and upset, "looking at people in a different light than I should... how I look at a wild animal that's ready to pounce, trying to figure out how to defend myself." Id. He said holding his anger took strenuous effort, leaving him "so physically drained that I'll fall asleep for two or three hours." Tr. 210. Mr. Gunkel said he got "horrendous headaches from stress" that lasted for days at a time. Id. Mr. Gunkel said he was not currently taking any medications or getting counseling. Tr. 210. He said he had discontinued the medications because they caused him to gain 125 pounds in less than three months. Tr. 211. Since stopping the medications, he had lost roughly 75 pounds. Tr. 211.

Mr. Gunkel said he handled his anger by "sink[ing] into a world of my own ... creation," in which he re-invented himself and "lash[ed] out at the people in my own private world, knowing that nobody will get hurt." Tr. 211. Mr. Gunkel said he spent approximately 13 or 14 hours a day in his private world. Tr. 212. He testified that he spends that time lying in the dark to help his headaches. Tr. 213. Mr. Gunkel said he spends two to three hours a day in the bathroom because of his irritable bowel condition. Id. However, he said he takes no medications except Excedrin Tension Headache from time to time. Tr. 214.

///

FINDINGS AND RECOMMENDATION Page 14

1   Mr. Gunkel said he has trouble hearing, reading lips to fill
2   in the words he doesn't hear. Id. However, Mr. Gunkel said his
3   hearing had been tested and that he was able to hear the beeps in
4   the hearing test, because he could "hear sharp sounds all right,"
5   but not "more elongated sounds." Tr. 214.

6   Mr. Gunkel currently lived with his father and visited his
7   mother nearly every day Tr. 215. On a typical day, he gets up at
8   about 11:00 a.m., gets dressed, walks down to his mother's house,
9   and eats. He spends a few hours at his mother's watching TV. Id.
10  Mr. Gunkel said he does some simple things for his mother on
11  occasion, such as hanging up laundry, taking out the garbage and
12  unloading the dishwasher. Id. After an hour or two he walks back
13  home. Id. He goes to his room to lie down and remains there,
14  "sinking in my own world," until his dog needed to be let out. Id.
15  Mr. Gunkel prepared simple meals, eating at about midnight, and
16  went to sleep at about 3:00 a.m. Tr. 216.

17  Sheron Gunkel, Mr. Gunkel's mother, testified at the hearing.
18  Mrs. Gunkel testified that when her son is at her house he "usually
19  just comes in and sits down and watches TV." Tr. 217. She said he
20  complained that he could not hear what she was saying unless she
21  looked at him. Id. Mrs. Gunkel said Mr. Gunkel had a problem with
22  anger, but that she thought it was because of the IBS. Id. She
23  stated that Mr. Gunkel was in the bathroom at her house for two to
24  three hours at a time nearly every day. Tr. 218. Mrs. Gunkel said
25  Mr. Gunkel also showed anger if she happened to ask him to take the
26  garbage out; if he didn't want to do it, "[h]e kind of yells." Tr.

27
28  FINDINGS AND RECOMMENDATION Page 15

218. Mrs. Gunkel testified that she is afraid of Mr. Gunkel because if he ever hit her, she was "going to go down." Tr. 219. She described Mr. Gunkel as having anger outbursts almost every day, and said that on a few occasions, he did not remember them. Tr. 220. She said she can tell when Mr. Gunkel is in his "other world," because sometimes when he's watching TV, "his lips will move and his hands will constantly move in different directions." Tr. 220.

Mrs. Gunkel testified that during the time he had his paper route, Mr. Gunkel was unable to do it three or four days a week because "his head would hurt so bad that he couldn't focus." Tr. 221.

Mr. Gunkel's father, Philip Gunkel, also testified, saying his son spent most of his time in his room, except for two or three hours a day in the bathroom. Tr. 223. Philip Gunkel said if he told his son to do something he didn't want to do, "he'll often times snap back at me or yell at me," tr. 223, so that at times he had "given up on telling him to do things ... because I just don't want to deal with it." Tr. 224. Philip Gunkel further testified that he had tried to get his son to drive a taxi for a while, but "he couldn't handle" even the better fares. Tr. 225.

VE Frances Summers testified. Tr. 225. The ALJ asked her to consider a person of Mr. Gunkel's age with no past relevant work, limited to a job with no public contact and only occasional coworker contact, and needing ready access to a bathroom. Tr. 227. The VE testified that such an individual could work as a janitor, an auto detailer, or a plumbing hardware assembler. Tr. 227. The

FINDINGS AND RECOMMENDATION Page 16

ALJ then asked the VE to consider that same individual, with the additional limitation of needing to be given simple routine tasks and instructions. Tr. 228. The VE said the additional limitation would not affect the three jobs to which she had testified. Id. The ALJ then asked whether the jobs would be ruled out if the individual were not able to do even simple routine tasks or be given simple instructions. Id. The VE testified that such a limitation would rule out competitive employment. Id.

Mr. Gunkel's attorney asked the VE to consider an individual with the additional limitations of needing to work in a darkened space, and the VE responded that such a limitation would reduce or eliminate the jobs she described. Id. The VE opined that a need to be in the bathroom for hours at a time would eliminate competitive employment as well. Tr. 229.

### ALJ's Decision

The ALJ found that Mr. Gunkel had bipolar disorder, anxiety disorder, and IBS, all severe impairments, but that Mr. Gunkel did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926. The ALJ found, consistent with reviewing psychologist Henry's assessment, that Mr. Gunkel's bipolar disorder and anxiety disorder caused him only mild restrictions in activities of daily living, moderate difficulties in social function, and moderate difficulties with maintaining concentration, persistence, and pace. ///

FINDINGS AND RECOMMENDATION Page 17

The ALJ concluded that Mr. Gunkel had the residual functional capacity to perform simple, routine tasks and follow simple, routine instructions and that he was precluded from public contact. Tr. 15. He could have occasional coworker contact. Id. The ALJ found that Mr. Gunkel "needs to have ready access to a bathroom," but that he had no exertional limitations. Id.

The ALJ found Mr. Gunkel's statements about the intensity, persistence and limiting effects of his symptoms were not "entirely credible" because they were not supported by the "objective medical evidence." Tr. 15. He noted that Mr. Gunkel's alleged onset date of October 24, 1999 was not supported by the evidence because Mr. Gunkel's earliest medical records were from May 2000 and reflected "mild issues." Id.

The ALJ cited to Dr. Richards's findings that Mr. Gunkel had normal range of motion of his neck, shoulders and elbows, and normal strength in the upper and lower extremities. Id. The ALJ took note of Dr. Richards' review of Mr. Gunkel's medical records, showing fatty liver, but no hepatitis, and a normal brain MRI. Id.

After reviewing the medical evidence in detail, the ALJ concluded that the objective medical evidence did not support Mr. Gunkel's contention that he was unable to work, because he was "on no medication whatsoever," and did "not complain of irritable bowel problems at his most recent recorded visit with Dr. Gallagher [in September 2005]." Tr. 22. The ALJ found that Mr. Gunkel did have mental issues for which he needed treatment. Id.

The ALJ noted that at the hearing, Mr. Gunkel did not appear

FINDINGS AND RECOMMENDATION Page 18

to have any auditory problems. Tr. 22. The ALJ concluded that "[o]verall, the objective evidence is quite mild and does not support claimant's extensive claims of problems." Tr. 24.

### Standards

The initial burden of proving disability rests on the claimant. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is

FINDINGS AND RECOMMENDATION Page 19

governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other available work in consideration of the claimant's age, education and past work

///

FINDINGS AND RECOMMENDATION Page 20

experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

## Discussion

Mr. Gunkel asserts that the Commissioner erred in three respects: failing to develop the record with respect to his physical impairments, failing to give credence to his own testimony, and failing to include all of his impairments in the hypothetical to the VE.

1.  <u>Failure to develop the record of physical impairments</u>

Mr. Gunkel asserts that the ALJ erred because he failed in his duty to develop the record by seeking clarification of Mr. Gunkel's physical impairments, either from his treating physician or from a consultative examiner. He contends that the ALJ failed to consider the impact of his headaches and light sensitivity and the severity of his IBS.

The ALJ's duty to fully and fairly develop the record is triggered "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." <u>Mayes v. Massanari</u>, 262 F.3d 963, 968 (9th Cir. 2001), *amended*, 276 F.3d 453 (9th Cir. 2002), citing <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001). The duty to develop the record does not extend to a silent record that does not support disability. <u>Armstrong v. Commissioner</u>, 160 F.3d 587, 589 (9th Cir. 1998).

The record is silent with respect to objective medical evidence that supports the existence of a medically determinable condition causing Mr. Gunkel severe headaches or photophobia, so

FINDINGS AND RECOMMENDATION Page 21

that a duty on the part of the ALJ to develop the record further is not triggered. Mr. Gunkel has denied head trauma. Mr. Gunkel reported to Dr. Gallagher in April 2002 that he had seen a neurologist for the headaches and had normal MRI and CT scans. A CT of the brain in August 2004 was normal. A neurological examination by Dr. Gallagher in September 2005 was normal. Dr. Tibbitts observed that Mr. Gunkel had a natural facial expression throughout the psychological evaluation and maintained normal eye contact. The medical record establishes that Mr. Gunkel has been tried on various headache medications, including Imitrex, Neurontin, Maxalt and ibuprofen, apparently without effect. Although the medical records do show some complaints about headaches caused by stress, there are also entries indicating that the headaches improved once Mr. Gunkel left school and learned to manage his stress better. The medical records give no indication that Mr. Gunkel is required to spend most of his day, every day, in a darkened room because of headaches.

The evidence with respect to Mr. Gunkel's IBS is not ambiguous or inadequate. The ALJ found that Mr. Gunkel's IBS was a severe impairment, and he asked the VE to consider an individual who required ready access to a bathroom. The medical evidence does not suggest a condition with a greater vocational impact than found by the ALJ. Dr. Gallagher noted that Mr. Gunkel had had "quite an extensive workup" for stomach pain that showed normal abdomen, pelvis and gallbladder except for fatty infiltration of the liver. A colonoscopy in November 2002 was normal except for mild to

FINDINGS AND RECOMMENDATION Page 22

moderate internal hemorrhoids. In December 2002, Dr. Gallagher wrote that five biopsies showed no pathological abnormalities in the sigmoid colon. Rectal biopsy showed only mild edema and congestion, negative for inflammatory bowel disease.

In the absence of ambiguity or inadequacy in the evidence, I find no error in the ALJ's failure to call Dr. Gallagher for additional testimony or to elicit testimony from a medical consultant on these alleged impairments.

2.   Erroneous credibility findings

Mr. Gunkel asserts that the ALJ should have given more credence to Mr. Gunkel's statements about headaches and IBS. He argues that Dr. Gallagher's opinions corroborate Mr. Gunkel's testimony that his symptoms prevent him from performing activities of daily living and work activities on a sustained basis.

The ALJ is entitled to make a credibility assessment of claimant's testimony. Polny v. Bowen, 864 F.2d 661 (9th Cir. 1988).

Mr. Gunkel's assertion that Dr. Gallagher has confirmed that he is unable to work because of his physical symptoms is not supported by the record. According to the letter from Mr. Gunkel's attorney summarizing her telephone conversation with Dr. Gallagher, Dr. Gallagher did not believe Mr. Gunkel's alleged headaches, neck pain, light sensitivity, asthma, difficulty hearing, left arm weakness, and difficulty sleeping "should prevent him from working." Tr. 198. The letter also states that Dr. Gallagher thought Mr. Gunkel had "few limitations physically to perform work, other than the limitations of his Irritable Bowel Syndrome

FINDINGS AND RECOMMENDATION Page 23

1  requiring ready [and] unrestricted access to a restroom." <u>Id.</u>

2        As discussed, the medical evidence does not support the

3  existence of a condition that would cause Mr. Gunkel severe daily

4  headaches and photophobia as alleged. With respect to the IBS, Dr.

5  Gallagher's recommendation was that Mr. Gunkel have ready and

6  unrestricted access to a restroom, which is the same occupational

7  requirement the ALJ included in his hypothetical to the VE.

8        I find no error in the ALJ's conclusion that Mr. Gunkel's

9  testimony was not entirely credible because it was not supported by

10  the medical evidence.

11        3.    <u>Improper use of vocational expert's testimony</u>

12        Mr. Gunkel contends that when posing his hypothetical to the

13  VE, the ALJ failed to consider Mr. Gunkel's need for a darkened

14  work space or the length of time Mr. Gunkel would need to spend in

15  the bathroom.

16        If the VE's hypothetical does not reflect all of a disability

17  claimant's limitations, the testimony has no evidentiary value to

18  support a finding that claimant can perform jobs in national

19  economy. <u>Matthews v. Shalala</u>, 10 F.3d 678 (9th Cir. 1993); <u>Embrey</u>

20  <u>v. Bowen</u>, 849 F.2d 418 (9th Cir. 1988).

21        On the other hand, the ALJ must propose a hypothetical that is

22  based on medical assumptions supported by substantial evidence in

23  the record that reflects each of the claimant's limitations.

24  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1163 (9th Cir. 2001); <u>Roberts v.</u>

25  <u>Shalala</u>, 66 F.3d 179, 184 (9th Cir. 1995). An ALJ is free to accept

26  or reject restrictions in a hypothetical question that are not

27

28  FINDINGS AND RECOMMENDATION Page 24

1  supported by substantial evidence. <u>Osenbrock</u>, 240 F.3d at 1165. If

2  the claimant fails to present evidence that he suffers from certain

3  limitations, the ALJ need not include those alleged impairments in

4  the hypothetical question to the VE. <u>Osenbrock</u>, 240 F.3d at 1164.

5      There is no substantial evidence in the record that supports

6  Mr. Gunkel's contention that he requires a darkened work space. The

7  objective clinical evidence does not support his claims of

8  photophobia, and by his own testimony, he reads and watches

9  television for several hours a day and also hangs up laundry, takes

10  out the garbage, and takes his dog outside. See tr. 215-16, 217,

11  218.

12      Nor does substantial evidence in the record support Mr.

13  Gunkel's contention that he requires employment that permits him to

14  spend several hours a day in the bathroom. Dr. Gallagher's opinion

15  was merely that because of his IBS, Mr. Gunkel needed ready and

16  unrestricted access to a bathroom, a limitation that the ALJ

17  included in his hypothetical to the VE.

**Conclusion**

18      I recommend that the Commissioner's decision be affirmed.

**Scheduling Order**

21      The above Findings and Recommendation will be referred to a

22  United States District Judge for review. Objections, if any, are

23  due December 17, 2007, 2007. If no objections are filed, review of

24  the Findings and Recommendation will go under advisement on that

25  date. If objections are filed, a response to the objections is due

26  December 31, 2007, and the review of the Findings and

28  FINDINGS AND RECOMMENDATION Page 25

Recommendation will go under advisement with the District Judge on

that date.

Dated this <u>30th</u> day of <u>November</u>, 2007.


/s/  Dennis James Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 26